UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAYSON STERBA<br>        Plaintiff,<br><br>        v.<br><br>THE ELEVANCE HEALTH COMPANIES,<br>INC. and CARELON RESEARCH, INC.,<br>        Defendants. | Civil Action No. |

## COMPLAINT

This is a complaint for failure to pay commissions pursuant to M.G.L. c. 149 § 148, breach of contract, and promissory estoppel.  Defendants failed to pay commissions owed under the terms of a Sales Incentive Plan for work performed by the Plaintiff.  On July 8, 2026, the Office of the Attorney General's Fair Labor Division granted the Plaintiff the right to pursue a private action under M.G.L. 149 § 150.

## Parties

1.      The Plaintiff, Jayson Sterba, is a resident of Newton, Massachusetts.  At all times relevant to this action Mr. Sterba has been a resident of Massachusetts.

2.      Defendant The Elevance Health Companies, Inc. d/b/a/ Elevance Health, Inc. ("Elevance Health"), is an Indiana corporation with its principal office located at 220 Virginia Avenue, Indianapolis, Indiana.  Elevance Health is registered with the

Massachusetts Secretary of the Commonwealth's Office as a foreign corporation registered to do business in Massachusetts.

3. Defendant Carelon Research, Inc. ("Carelon Research"), maintains its corporate headquarters at 123 Justison Street, Wilmington, Delaware, and an office at 55 Chapel Street, Newton, Massachusetts.

4. On information and belief, Carelon Research is a wholly owned subsidiary of Elevance Health.

## Jurisdiction and Venue

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the suit is between citizens of different States and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## Facts

7. Mr. Sterba became an employee of Elevance Health as Carelon Research Sales Director, Real World Data Products, in May, 2025.

8. Carelon Research Real World Data Products are a compilation of de-identified health records and insurance claims from individuals throughout the United States. Carelon Research describes its Real World Data as an "analysis-ready closed claims dataset linked with electronic health records."

9.     Carelon Research Real World Data includes health-related information for individuals enrolled in health insurance plans and is used as a source for health-related research.

10.     As Sales Director, Real World Data Products, Mr. Sterba is responsible for commercializing and selling Carelon Research's Real World Data Products.

11.     At all relevant times Mr. Sterba has worked out of Carelon Research's Newton, Massachusetts office.

12.     Mr. Sterba's compensation includes a base salary, as well as participation in Carelon Research's Sales Incentive Plan.  Attached as **Exhibit A** is a true and accurate copy of Carelon Research's Sales Incentive Plan.

13.     The Sales Incentive Plan, effective October 1, 2025, was signed by four individuals on behalf of Carelon Research including Carelon Research's President, its Executive Director of Growth and Business Planning, Elevance Health's HR Business Partner, and the Compensation Manager, as well as Mr. Sterba.

14.     The Sales Incentive Plan identifies Craig Waltz – Executive Director of Growth and Business Planning and Mr. Sterba's direct supervisor – as the Plan Administrator.

*Sales Incentive Plan*

15.     The Sales Incentive Plan states that its purpose is to "reward eligible sales associates for outstanding performance in both selling new business and maintaining

3

their existing book of business in ways consistent with what management has determined to be in the best interest of the Company."

16.     The Sales Incentive Plan states that, "[t]he goal is to create a strong link between compensation and growth in profitability," and that it is "designed to reward associates who meet the Company's sales challenges."

17.     The Sales Incentive Plan defines "Client" as "the company awarding the business" and states that a Client is "typically a pharmaceutical, biotechnology, diagnostic, or medical device company."

18.     The Sales Incentive Plan states that Incentive Awards are earned when the following requirements are met:

(1)  A Plan Participant has been significantly involved in the business development process and instrumental in securing New Sales;

(2)  A Plan Participant must be employed to receive an incentive award;

(3)  A research services contract is executed between the Client and the Company;

(4)  The sale is classified as "Closed – Won" in the customer relationship management system; and

(5)  Incentive awards apply only to external clients that are Life Sciences Research organizations.

4

19.    As Sales Director of Real World Data Products, Mr. Sterba sells data products, not "research services" as listed under (3) above.  Although other individuals sell research services contracts, Mr. Sterba sells data licensing agreements.

20.    This ambiguity in the Sales Incentive Agreement appears to arise as a result of the Sales Incentive Agreement being adapted from use with other employees.

21.    The Sales Incentive Plan also states that awards apply only to external clients that are "Life Sciences Research organizations."

22.    However, the Sales Incentive Plan does not define "Life Sciences Research organizations."

23.    The Sales Incentive Plan identifies two commission categories for lead generation concerning new sales contracts:  2.0% commission for sales generated directly from a client; and 1.0% commission for sales generated from a lead provided by a Carelon Research employee.

24.    The Sales Incentive Plan provides that any amendments or changes will "not be applied retrospectively."

*Prospect A*

25.    On January 16, 2026, Mr. Waltz directed Mr. Sterba to pursue "Prospect A" as a client.

26. Prospect A accelerates the drug development lifecycle for life sciences companies by providing, *inter alia*, a proprietary AI platform that curates de-identified health records to decode real-world prescriber behavior.

27. Prospect A also publishes original peer-reviewed Health Economics and Outcomes Research and Real-World Evidence studies at life sciences research conferences using integrated health data.

28. Prospect A is exactly the type of life sciences research and analytics organization that would use Carelon Research's Real World Data as part of its organizational mission.

29. Mr. Sterba successfully pursued the lead from initial outreach through contract execution.

30. Mr. Sterba was significantly involved in the Prospect A business development process and instrumental in securing the Prospect A New Sale.

31. The Prospect A transaction was classified as Closed-Won in the Company's customer relationship management system.

32. At no time before the Prospect A transaction closed did Defendants inform Mr. Sterba that Prospect A would be treated as non-commissionable account under the Sales Incentive Plan.

33. As a result of Mr. Sterba's sales efforts Carelon Research executed a contract with Prospect A on March 17, 2026, for $850,000.00.

6

34. Mr. Sterba is entitled to a commission equal to 1.0% of the Prospect A contract value, or $8,500.00, because the lead was provided to Mr. Sterba by his supervisor, who is also the Plan Administrator.

*Prospect K*

35. On January 27, 2026, Mr. Waltz asked Mr. Sterba to pursue "Prospect K" as a client.

36. Prospect K is a life sciences technology, research, evidence and analytics organization that provides real-world data analytics and AI tools to its own researchers and other life sciences companies.

37. Prospect K uses artificial intelligence and real-world patient data to assist companies in performing research and tracking patient outcomes.

38. Prospect K provides real-world health data used extensively in white papers and research published within the life sciences field.

39. Prospect K publishes original peer-reviewed Health Economics and Outcomes Research and Real-World Evidence studies at life sciences research conferences using integrated health data.

40. Prospect K regularly presents research studies at major life sciences research conferences and offers consulting services to support external publications.

41. Mr. Sterba was significantly involved in the Prospect K business development process and instrumental in securing the Prospect K New Sale.

7

42.    The Prospect K transaction was classified as Closed-Won in the Company's customer relationship management system.

43.    At no time before the Prospect K transaction closed did Defendants inform Mr. Sterba that Prospect K would be treated as non-commissionable account under the Sales Incentive Plan.

44.    As a result of Mr. Sterba's efforts Carelon Research executed a contract with Prospect K on March 27, 2026, for $15,000,000.00.

45.    Mr. Sterba is entitled to a commission equal to 1.0% of the Prospect K contract value amounting to a commission of $150,000.00.

*Defendants Raised Eligibility Objections Only After the Prospect A and K Deals Closed and Mr. Sterba's Commissions Became Due*

46.    On April 2, 2026, Mr. Waltz, as Plan Administrator, circulated the Sales Incentive Plan report for the first quarter of 2026.  The 2026 Q1 Sales Incentive Plan Report included both Prospect A and Prospect K as fully executed "Closed – Won" contracts.

47.    On April 21, 2026, Mr. Waltz sent Mr. Sterba a Microsoft Teams note stating for the first time that the plan "does not account for non-LSR accounts."  Mr. Waltz further stated that he was "working through this as well as the amounts," adding that "$15M is a big jump" and that he needed to "model some more."

8

48.     The Sales Incentive Plan does not contain a cap, windfall clause, or large-deal adjustment provision that would reduce or eliminate commissions because the customer contracts exceed certain financial thresholds.

49.     On April 22, 2026, Mr. Waltz sent Mr. Sterba an email with an "Updated SIP" to review.  The proposed "Updated" Sales Incentive Plan had an effective date of March 20, 2026 – *prior* to the closing of the contracts with Prospect A and Prospect K.  Attached as **Exhibit B** is a true and accurate copy of the "Updated" Sales Incentive Plan provided to Mr. Sterba on April 22, 2026.

50.     In his email Mr. Waltz stated that "The main driver of [the Updated Sales Incentive Plan] was the decision I made earlier this year about having you call on markets outside of life sciences.  The current plan only handles this market segment, and we need a much broader approach to meet our business expectations."

51.     The proposed "Updated" Sales Incentive Plan contains material changes to the terms of the Sales Incentive Plan entered into between Defendants and Mr. Sterba.

52.     The Sales Incentive Plan defines "Client" as "the company awarding [Carelon Research] the business and is *typically* a pharmaceutical, biotechnology, diagnostic or medical device company." (Emphasis added.)

53.     The proposed "Updated" Sales Incentive Plan proposed by Mr. Waltz defines "Client" as a company "in a market approved for Carelon Real World Data."

54.     The Sales Incentive Plan does not define "Life Sciences Research organizations," and does not require that the Client's primary business must be a "Life Sciences Research organization."

55.     The proposed "Updated" Sales Incentive Plan introduces a new term and defines "Life Sciences Company" as "an entity whose primary business is the research, development, manufacture, or commercialization of pharmaceuticals, biologics, biotechnology products, medical devices or diagnostic tests."

56.     And perhaps most telling, the proposed "Updated" Sales Incentive Plan replaces the straight percentage commission on sales with a "sliding scale" reducing commissions on sales over $1,000,000.00.  For example, the proposed "Updated" Sales Incentive Plan reduces the commission on the sale of a $15,000,000.00 contract – like the one Mr. Sterba closed – from $150,000.00 to $63,000.00.

57.     Mr. Sterba was provided the proposed "Updated" Sales Incentive Plan more than 21 days after both deals had been fully executed, and after the close of Q1 2026.

58.     On April 23, 2026, Mr. Sterba responded to Mr. Waltz stating that he would not agree to retroactive changes to the Sales Incentive Plan previously executed.

59.     In response, Mr. Waltz asserted for the first time that Prospect A and Prospect K did not qualify as "Clients" under the Sales Incentive Plan because they are not pharmaceutical, biotechnology, diagnostic, or medical device companies.

10

60.    However, the Sales Incentive Plan in effect at the time defines "Client" as "the company awarding [Carelon Research] the business and is *typically* a pharmaceutical, biotechnology, diagnostic or medical device company." (Emphasis added.)

61.    On April 29, 2026, pursuant to the terms of the Sales Incentive Plan, Mr. Sterba petitioned the Incentive Committee to review Mr. Waltz's determination that Prospect A and Prospect K did not qualify as "Clients" under the Plan and to confirm that retroactive changes could not be made to the Sales Incentive Plan in effect.

62.    On June 2, 2026, the Incentive Committee responded to Mr. Sterba in writing indicating that Prospect A and Prospect K did not qualify for Incentive Awards under the Sales Incentive Plan – *not* because they are not pharmaceutical, biotechnology, diagnostic, or medical device companies as Mr. Waltz had stated – but because they are not "Life Sciences Research organizations."

63.    The June 2, 2026 determination by the Incentive Committee did not dispute that Mr. Sterba was significantly involved in securing the transactions, that the contracts were fully executed, that the transactions were classified as Closed-Won, or that the commission amounts were mathematically calculable under the Sales Incentive Plan.  Nor did the refusal turn on the fact that the contracts were not "research services contracts" – which they were not.

11

64.     Defendants' refusal to award Mr. Sterba the commissions due turned solely on Defendants' after-the-fact interpretation that the Clients did not meet the undefined definition of "Life Sciences Research organizations."

65.     The Incentive Committee offered Mr. Sterba a "one-time discretionary payment" amounting less than half the amount of his earned commissions.

66.     Defendants have not made any commission payments to Mr. Sterba as a result of the Prospect A or the Prospect K contract signings.

67.     Defendants drafted the Sales Incentive Plan and any ambiguity in its terms should be construed against the Defendants.

### COUNT I – The Elevance Health Companies, Inc.
### Failure to Pay Commissions – M.G.L. c. 149 § 148

68.     Plaintiff repeats and realleges the allegations made in the preceding paragraphs as though fully set forth herein.

69.     Elevance Health is an employer pursuant to M.G.L. c. 149 § 148.

70.     Mr. Sterba worked as an employee of Elevance Health.

71.     Elevance Health executed, accepted, and/or benefited from contracts with Prospect A and Prospect K collectively worth $15,850,000.00.

72.     Mr. Sterba earned commissions that were definitely determined, due and payable pursuant to the terms of the Sales Incentive Plan signed and entered into with Elevance Health.

73.     Mr. Sterba is owed commissions pursuant to the Sales Incentive Plan.

12

74.    Elevance Health has not made any commission payments to Mr. Sterba as a result of the Prospect A or the Prospect K contract signings.

75.    Mr. Sterba has been damaged by Elevance Health's failure to pay commissions pursuant to the Sales Incentive Plan.

76.    Plaintiff seeks unpaid commissions, mandatory treble damages and attorneys' fees.

## COUNT II – Carelon Research, Inc.
### Failure to Pay Commissions – M.G.L. c. 149 § 148

77.    Plaintiff repeats and realleges the allegations made in the preceding paragraphs as though fully set forth herein.

78.    Carelon Research is an employer pursuant to M.G.L. c. 149 § 148.

79.    Mr. Sterba worked as an employee of Carelon Research.

80.    Carelon Research executed, accepted, and/or benefited from contracts with Prospect A and Prospect K collectively worth $15,850,000.00.

81.    Mr. Sterba earned commissions pursuant to the terms of the Sales Incentive Plan signed and entered into with Carelon Research.

82.    Mr. Sterba is owed commissions that were definitely determined, due and payable pursuant to the Carelon Research Sales Incentive Plan.

83.    Carelon Research has not made any commission payments to Mr. Sterba as a result of the Prospect A or the Prospect K contract signings.

13

84.    Mr. Sterba has been damaged by Carelon Research's failure to pay commissions pursuant to the Sales Incentive Plan.

85.    Plaintiff seeks unpaid commissions, mandatory treble damages and attorneys' fees.

## COUNT III – All Defendants
### Breach of Contract

86.    Plaintiff repeats and realleges the allegations made in the preceding paragraphs as though fully set forth herein.

87.    Mr. Sterba and Defendants executed a Sales Incentive Plan, effective October 1, 2025.

88.    The Sales Incentive Plan is a part of Mr. Sterba's employment agreement.

89.    Mr. Sterba's agreement to work for the Defendants was made in part due to the ability to participate in the Sales Incentive Plan.

90.    Mr. Sterba successfully pursued leads provided by the Defendants and caused Prospect A and Prospect K to execute contracts with the Defendants collectively worth $15,850,000.00.

91.    The Prospect A and Prospect K contracts met all of the requirements to earn an Incentive Award pursuant to the Sales Incentive Plan.

92.    Defendants circulated the Sales Incentive Plan report for the first quarter of 2026 that listed both the Prospect A and Prospect K as fully executed "Closed – Won" contracts.

93.     Defendants first claimed that Prospect A and Prospect K did not qualify as "Clients" under the Sales Incentive Plan, then claimed that Prospect A and Prospect K were not "Life Sciences Research organizations" – a term not defined by the Sales Incentive Plan.

94.     Mr. Sterba is owed $158,500.00 pursuant to the Sales Incentive Plan.

95.     Defendants breached their agreement pursuant to the Sales Incentive Plan by failing to pay Mr. Sterba as a result of the Prospect A and Prospect K contract signings.

### COUNT IV – All Defendants
### Promissory Estoppel

96.     Plaintiff repeats and realleges the allegations made in the preceding paragraphs as though fully set forth herein.

97.     Defendants promised to pay Mr. Sterba a commission on sales as set forth in the Sales Incentive Plan signed by both Mr. Sterba and Defendants.

98.     Defendants' Sales Incentive Plan was specifically designed to "reward sales associates for outstanding performance in [] selling new business" and "maintaining their existing book of business" in order to "create a strong link between compensation and growth in profitability," and to reward associates who "meet the Company's sales challenges."

15

99.     Defendants expected that their promise to honor the terms of the Sales Incentive Plan would reasonably induce Mr. Sterba to meet the Company's sales challenges.

100.     Mr. Sterba reasonably relied on the promises set forth by the Defendants in the Sales Incentive Plan.

101.     Defendants benefitted greatly from new contracts executed based Mr. Sterba's reliance on Defendants' promise of an Incentive Award.

102.     Mr. Sterba suffered harm as a result of his reliance on Defendants' promise of an Incentive Award.

103.     Injustice can only be avoided by enforcing Defendants' promise as set forth in the Sales Incentive Plan.

WHEREFORE, Plaintiff, Jayson Sterba, hereby requests that this Court find that:

a.  Pursuant to Count I, The Elevance Health Companies, Inc. is liable to Mr. Sterba for unpaid commissions in the amount of $158,500.00 plus treble damages and attorneys' fees pursuant to M.G.L. c. 149 §§ 148 and 150;

b.  Pursuant to Count II, Carelon Research, Inc. is liable to Mr. Sterba for unpaid commissions in the amount of $158,500.00 plus treble damages and attorneys' fees pursuant to M.G.L. c. 149 §§ 148 and 150;

16

c.  Pursuant to Count III, The Elevance Health Companies, Inc. and Carelon

Research, Inc. are jointly and severally liable to Mr. Sterba for breach of

contract in the amount of $158,500.00;

d.  Pursuant to Count IV, The Elevance Health Companies, Inc. and Carelon

Research, Inc. are jointly and severally liable to Mr. Sterba for promissory

estoppel in the amount of $158,500.00; and

e.   Award such other or further relief and the court deems just and fair.


**PLAINTIFF REQUESTS A JURY ON ALL CLAIMS SO TRIABLE.**


Respectfully submitted,

JAYSON STERBA,

By his counsel,

Kenneth C. Pickering, BBO #634121
Pickering Legal LLC
100 Grove Street
Worcester, MA 01605
508-498-3880

Dated: August 6, 2026                      kpickering@pickering-legal.com


17